Lynch, J.
 

 Appeal from an order of the Family Court of Broome County (Connerton, J.), entered February 11, 2016, which, among other things, partially granted petitioner’s application, in a proceeding pursuant to Family Ct Act article 6, for custody of the parties’ child.
 

 Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the parents of a child (born in 2014). The parties, who are both Israeli citizens, were introduced in Israel because both wanted to have a child. The child thereafter was conceived pursuant to an agreement made while the mother was living in Israel and the father was living in the United States. Their agreement (hereinafter the parenting agreement) was reduced to writing and executed by both parties after the mother became pregnant and had moved to the United States. At the time this proceeding was commenced, the father held a green card and was eligible to apply for United States citizenship. The mother was residing in the United States pursuant to a student visa that was about to expire.
 

 Although the preamble to the parenting agreement states that the parties planned a civil marriage, the parties never married. The parenting agreement also provided that the mother would relocate to the United States prior to the child’s birth and, if the mother was not working, the father would “take[ ] care” of all of her expenses. As to custody, the parties provided for different scenarios depending on whether they were residing in Israel or the United States. As to the latter, the parties agreed that they would share joint custody if they were residing together but, if they were living separately, the child would live with the mother, and the father would have parenting time during the week, with overnight parenting time beginning after the child turned one. The parties also included comprehensive provisions for custody and parenting time in the event that the mother was living in Israel and the father was living in the United States. In the event there was a dispute, the parties agreed that “Family Court in [Israel would] have sole jurisdiction to judge any matter involving or resulting from the agreement.”
 

 In April 2015, the father petitioned for custody of the child. The mother answered and moved to dismiss the father’s petition based on the provision of the parenting agreement that placed jurisdiction of custodial matters with Family Court in Israel. Family Court denied the mother’s motion to dismiss, finding, among other things, that it had subject matter jurisdiction and that the forum selection clause was unenforceable on public policy grounds. Following a fact-finding hearing, Family Court granted the father primary physical and sole legal custody of the child with parenting time to the mother. The order also prohibited the removal of the child from the United States without the written consent of both parties. The mother now appeals.
 

 As a threshold matter, the mother argues that the forum selection clause in the parenting agreement divests Family Court of jurisdiction to decide this custody matter. We disagree. The Uniform Child Custody Jurisdiction and Enforcement Act (see Domestic Relations Law art 5-A) provides that a New York court has jurisdiction to make an initial custody determination only if, as relevant here, “[New York] is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding” (Domestic Relations Law § 76 [1] [a]; Matter of Chichester v Kasabian, 82 AD3d 1511, 1511 [2011]). A child’s home state is “the state in which a child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child custody proceeding” (Domestic Relations Law § 75-a [7]). Because the parties’ child has never lived anywhere but in New York, making New York the child’s home state, Family Court properly exercised jurisdiction (see Matter of Lewis v Martin, 134 AD3d 1179, 1181 [2015]).
 

 Next, and contrary to the father’s argument, we find that the mother’s claim that New York was an inconvenient forum was preserved for our review. To this point, despite its finding that New York was the child’s home state, Family Court had the discretion to decline jurisdiction on the ground that New York was an inconvenient forum after consideration of eight statutory factors (see Matter of Frank MM. v Lorain NN., 103 AD3d 951, 952 [2013]; see Domestic Relations Law § 76-f [2]). Here, the only factor raised by the mother was the parenting agreement. The existence of an “agreement of the parties as to which state should assume jurisdiction” is one factor that may be considered when making a determination with regard to whether New York is an inconvenient forum (Domestic Relations Law § 76-f [2] [e]), but “parties cannot, by agreement, confer jurisdiction on [another] state” (DeJac v DeJac, 17 AD3d 1066, 1068 [2005], lv denied 20 AD3d 946 [2005]). Although Family Court did not specifically address all of the remaining factors, upon our permissible review of the extensive record (see Matter of Frank MM. v Lorain NN., 103 AD3d at 953), we discern no basis for finding that New York is an inconvenient forum.
 

 Turning to the merits, an initial custody determination must be based on the best interests of the child, a determination made after “reviewing such factors as maintaining stability for the child, the child’s wishes, the home environment with each parent, each parent’s past performance, relative fitness, ability to guide and provide for the child’s overall well-being, and the willingness of each parent to foster a relationship with the other parent” (Matter of Lilly NN. v Jerry OO., 134 AD3d 1312, 1313 [2015] [internal quotation marks, brackets and citations omitted]). Relevant here, although a custodial agreement between the parties that has not been reduced to an order is a factor to consider (see Matter of Joseph G. v Winifred G., 104 AD3d 1067, 1068 [2013], lv denied 21 NY3d 858 [2013]), it is not dispositive because “[a] promise affecting the right of custody of a minor child is unenforceable on grounds of public policy unless the disposition as to custody is consistent with the best interest of the child” (Restatement [Second] of Contracts § 191). Further, where, as here, an initial custody determination involves one parent who wishes to relocate with the child, the parent’s “decision to reside in a distant locale is a very important factor among the constellation of factors to be considered in arriving at a best interests determination, particularly where there is evidence that it would detrimentally affect the other parent’s relationship with the child” (Matter of Bush v Lopez, 125 AD3d 1150, 1150 [2015] [internal quotation marks and brackets omitted]). Because Family Court has a “superior ability to observe and assess the witnesses’ testimony and demeanor firsthand, its factual findings and credibility determinations—if supported by sound and substantial evidence—will not be disturbed” (Matter of DiMele v Hosie, 118 AD3d 1176, 1177 [2014]; see Matter of William BB. v Melissa CC., 136 AD3d 1164, 1166 [2016]).
 

 At the fact-finding hearing, the mother testified that she was working as a nanny in Israel when she and the father were introduced for the purpose of conceiving and raising a child together. In December 2013, when she was approximately four months pregnant, she moved to the United States with the belief that she would live in Reno, Nevada where the father worked as a cardiologist, that they would marry and that she would become a legal resident of the United States. Unfortunately, the father lost his job in Reno and obtained a new job in the Town of Potsdam, St. Lawrence County. Accordingly, the mother moved from Israel to Potsdam in December 2013 and remained there with the father through the winter without a driver’s license or access to public transportation. After two months in Potsdam, the father obtained a job in the City of Binghamton, Broome County, where the two moved and the child was born. At some point after the mother relocated to the United States, the father advised that it was no longer possible for him to marry her, so she obtained a student visa and began to attend classes at a community college to earn a degree as a lab technician. While the mother was at school, the child was with a nanny for a period of time before obtaining a spot at a day-care center approved by both parents. When the parties determined to separate after the child was born, the father purchased a home for the mother and child to live in and a car for the mother to drive, paid the mother’s tuition and all of the child’s expenses and gave the mother $1,500 each month.
 
 [1]
 

 In addition to the parties, Family Court also heard testimony from, among others, the parties’ nanny, day-care workers and the mother’s friends. The father’s witnesses recounted incidents when the mother became angry over seemingly trivial matters, indicated a desire to return to Israel—both with and without the child—and exhibited other disconcerting behavior. For example, the mother disclosed to the nanny that she wanted to return to Israel and that she could not handle the child, the mother was asked to stop visiting the day-care center because her prolonged visits were impairing the child’s ability to transition and she resisted signing in and out at day care because she believed the sign-in rule was designed to allow the father to spy on her. In April 2015, at the nanny’s urging, the mother checked herself in to a crisis center where she presented with “depressed and suicidal thoughts.” Although inpatient treatment was recommended, the mother asked to leave and was discharged in stable condition the same day. She did not follow up with treatment recommendations.
 

 In contrast, the mother’s friends testified that while the mother was occasionally tearful, she was a loving and attentive parent. The mother did not dispute that it was difficult for her to leave the child at day care and that there were occasions when she lost her temper with both the nanny and the father, and she conceded that on one occasion she pushed the father. The mother downplayed her outbursts and denied that these incidents were harmful to the child.
 

 Sandra Antoniak, a psychiatrist retained by the father to perform a forensic psychiatric evaluation of the mother, testified that the mother suffered from moderate, recurrent depression and from a personality disorder, not otherwise specified, with borderline features.
 
 [2]
 
 According to Antoniak, the mother’s depression was worsened by “difficulty adjusting to a new culture [which] negatively impacted] her mood and increased] her feelings of social isolation.” The mother testified that she wished to adhere to the parties’ parenting agreement and return with the child to Israel. The father testified that because he believed that the mother was unstable and likely to abscond with the child, her parenting time had to be limited and supervised.
 

 We are unable to conclude that Family Court’s determination to award primary physical custody to the father with unsupervised visitation to the mother lacked a sound and substantial basis in the record. It is apparent that both parents love the child and, for the most part, each believed that the other was capable of being a good parent to the child. As Family Court noted, despite his claims that the mother was unstable during the pregnancy and throughout the child’s infancy, the father was able to leave the child with the mother for nearly a month in December 2014 when a planned 10-day trip to Israel was extended due to an illness and for another week-long trip to Israel in February 2015. Further, even after he filed his petition, he left the child with the mother overnight when he was obligated to travel for work.
 

 We are sympathetic to the mother’s stated desire to leave the United States, where she is dependent on the father’s continued largesse, to return to Israel, where she could work and seek support from family and friends. Like Family Court, however, we find no basis in the record to conclude that it is in the child’s best interests to leave the United States to reside with the mother in Israel. The mother offered only vague testimony with regard to where she would live and work if permitted to return to Israel and did not have an actual plan in place. In contrast, the father owns a home where the child has lived periodically since birth, is gainfully employed and, with the assistance of the nanny and day care, can continue to care for the child notwithstanding the demands of his cardiology practice. While the mother clearly wants to provide a stable home for the child, at the time of the hearing, she did not express a plan or ability to make this happen. When we defer to the court’s ability to assess each party’s demeanor and credibility, we find that the record supports the court’s determination to award primary physical custody to the father (see Matter of Driscoll v Oursler, 146 AD3d 1179, 1182 [2017]; Matter of Cowper v Vasquez, 121 AD3d 1341, 1343 [2014], lv denied 24 NY3d 913 [2015]).
 

 We conclude, however, that Family Court should not have awarded the father sole legal custody. Despite the father’s controlling behavior and the mother’s anger and frustration towards him, there was limited evidence with regard to an inability to communicate for the benefit of the child. Rather, for the most part, the parties were able to communicate, albeit via text messages. Moreover, by granting sole legal custody to the father, the mother is deprived of an ability to file a petition under the terms of the Hague Convention on International Child Abduction (see Matter of Ish-Shalom v Wittmann, 19 AD3d 493, 494 [2005]). While we do not discern a present scenario where such relief would be necessary, in light of the atypical circumstances of this case—including the father’s dual citizenship—we believe this potential issue can and should be avoided. In sum, on this record, we do not find a sound and substantial basis for Family Court’s determination to award sole legal custody to the father and we instead grant joint legal custody to the mother and the father (see Matter of Finkle v Scholl, 140 AD3d 1290, 1292 [2016]; Ehrenreich v Lynk, 74 AD3d 1387, 1389-1390 [2010]). To be clear, however, because we share Family Court’s concerns, the requirement that the child shall not be removed from the United States for any reason without written consent of both parties is continued and, in the event that the parties are unable to agree, the father shall retain decision-making authority with regard to the child (see Matter of Ish-Shalom v Wittmann, 19 AD3d at 494).
 

 Finally, turning to Family Court’s award of parenting time to the mother, we are mindful that the mother testified that her student visa was going to expire if her tuition was not paid and that the father had threatened to not pay the tuition.
 
 [3]
 
 During oral argument, counsel confirmed that the mother’s visa did in fact expire and that she is currently residing in Israel. As such, Family Court’s visitation order is effectively unworkable. Under these extraordinary circumstances and in the interest of justice, we exercise our independent review power (see Matter of Staff v Gelunas, 143 AD3d 1077, 1079-1080 [2016]) and find that Family Court’s order should have included a means for the mother to exercise parenting time in the event that she was no longer a legal resident of the United States. Unfortunately, given the passage of time and limited record, we are not able to adjust the parenting time, but find that the matter must be remitted to Family Court to structure a meaningful parenting time schedule. Notably, the parenting agreement included a provision that the father would be financially responsible for arranging visitation with the child if the child were residing primarily with the mother in Israel. As we stated above, this is a factor that Family Court can consider when fashioning the mother’s parenting time schedule.
 

 McCarthy, J.P., Rose, Clark and Pritzker, JJ., concur.
 

 Ordered that the order is modified, on the law and the facts, without costs, by reversing so much thereof as awarded sole legal custody of the child to petitioner; petitioner and respondent are awarded joint legal custody of the child and matter remitted to the Family Court of Broome County for further proceedings not inconsistent with this Court’s decision; and, as so modified, affirmed.
 

 [1]
 

 . The mother testified that the student visa did not allow her to work so she was unable to earn money for herself.
 

 [2]
 

 . By her report, Antoniak clarified that the personality disorder was based on the history other paranoia, black and white thinking and impulsivity; such diagnosis was “not otherwise specified because she did not meet the full criteria and was suffering with untreated depression” and that the borderline features “pertain! ] to her cognitive distortions,” for example, “[s]he stated she did not trust psychotherapists or psychiatrists and that she preferred to use a life coach to treat her depression.”
 

 [3]
 

 . The mother testified in November 2015 that her visa would expire on January 13, 2016. Although it is not entirely clear, during her testimony in January 2016, it appears she was in school and that her visa was set to expire in December 2016.