Matter of Joseph II. v Brandy JJ. (2022 NY Slip Op 06658)

Matter of Joseph II. v Brandy JJ.

2022 NY Slip Op 06658

Decided on November 23, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:November 23, 2022

532509
[*1]In the Matter of Joseph II., Respondent,
v
Brandy JJ., Appellant. (And Another Related Proceeding.)

Calendar Date:October 18, 2022

Before:Garry, P.J., Lynch, Reynolds Fitzgerald, Ceresia and McShan, JJ.

Timothy S. Brennan, Albany, for appellant.
Alexandra G. Verrigni, Rexford, for respondent.
Trinidad M. Martin, Glens Falls, attorney for the child.

Garry, P.J.
Appeal from an order of the Family Court of Washington County (Adam D. Michelini, J.), entered October 23, 2020, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody.
Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the parents of the subject child (born in December 2014). In April 2015, the mother took the child from New York to California to visit family, and, after some time there, she elected to stay. The father petitioned for custody of the child thereafter, and, following some uncertainty as to whether the mother would return to New York,[FN1] Family Court issued a June 2016 order, on consent, pursuant to which the parents were to share legal and physical custody, with the child to spend half the year (April 7 to October 7) residing with the father in New York and half the year (October 7 to April 7) residing with the mother in California. The order further provided that, if by June 2020 the parties had not decided where the child would attend kindergarten, then either party could petition the court for modification.
The father exercised his parenting time following entry of the foregoing order, and the child was exchanged pursuant thereto in October 2016. In February 2017, the father, along with his child from another prior relationship, moved to California in an attempt to reconcile with the mother, and the parties lived together there for approximately six months until they again separated. The father remained in California thereafter to complete an educational program, and, during that period, the parties operated under a two-day, rotating parenting time schedule. In January 2019, the father completed his program and returned to New York, and the parties agreed to resume the court-ordered custody arrangement.
Prior to the next custodial exchange, set to take place in April 2020, the father informed the mother that he would be unable to travel to California to retrieve the child for financial reasons. He was able to procure tickets in June 2020 and informed the mother that he would be traveling to pick up the child. The mother then obtained a restraining order against the father from a California court, alleging that he had physically abused her while the parties were in New York, that she had fled to California for her safety, that the father later made certain threats to her life and that she feared that he would return and hurt her or the child. The restraining order was vacated following a court appearance in California, and the father returned to New York with the child in July 2020.
Upon his return, the father commenced the first of the subject modification proceedings, seeking primary physical custody of the child and alleging that the parties were unable to come to an agreement as to where the child would attend school. The mother moved to dismiss his petition for lack of jurisdiction, arguing that California [*2]is the child's home state. Family Court denied that motion, and the mother then answered and cross-petitioned for primary physical custody. Following a fact-finding hearing, Family Court granted the father primary physical custody, with the mother having open and liberal parenting time in New York, an extended period in California during the summer and certain rotating holidays. The mother appeals.
As a threshold matter, the mother maintains that Family Court lacked jurisdiction to decide the father's custody petition.[FN2] Where, as here, a court of this state has made a child custody determination, it has "exclusive, continuing jurisdiction over the determination until . . . a court of this state determines that neither the child, [nor] the child and one parent, . . . have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships" (Domestic Relations Law § 76-a [1] [a]) or "a court of this state or a court of another state determines that the child [and] the child's parents . . . do not presently reside in this state" (Domestic Relations Law § 76-a [1] [b]).
Initially, the parties agree that no California court has rendered any determination relevant to the residence of the child. Although the father moved to California for a period of time, he presently resides in the Town of Granville, Washington County, where he was born and raised and where his family and the child's paternal half sibling live (see Matter of Seminara v Seminara, 111 AD3d 949, 950-951 [2nd Dept 2013]; Matter of Mercado v Frye, 104 AD3d 1340, 1341 [4th Dept 2013], lv denied 21 NY3d 859 [2013]). Following the father's return to New York, the child's visitation with the father occurred here under the terms of the June 2016 order (see Matter of Hissam v Mancini, 80 AD3d 802, 803 [3d Dept 2011], lv dismissed and denied 16 NY3d 870 [2011]; Matter of Sutton v Sutton, 74 AD3d 1838, 1839 [4th Dept 2010]). Although certain evidence concerning the child's care, protection, training and personal relationships may be in California given the split-year, bicoastal nature of the prior custody arrangement, the same is true of New York (see Matter of Helmeyer v Setzer, 173 AD3d 740, 743 [2d Dept 2019]; Matter of Belcher v Lawrence, 98 AD3d 197, 201 [3d Dept 2012]). Any relevant testimony from those in California was able to be, and indeed was, presented "by telephone, audiovisual means, or other electronic means" (Domestic Relations Law § 75-j [2]). Additionally, evidence regarding what custodial arrangement would serve the child's best interests is present in New York given that Family Court possessed pertinent information regarding the parties' circumstances prior to the June 2016 consent order (see Matter of Belcher v Lawrence, 98 AD3d at 201). Similarly, the attorney for the child who had been assigned in the prior proceedings was reengaged for the subject proceedings[*3]. We therefore agree with Family Court's conclusion that the child and the father continue to have a significant connection to New York and that substantial evidence relevant to this custody matter exists in this state.
The mother now also argues that New York is an inconvenient forum (see Domestic Relations Law § 76-f). Even liberally construing her motion, and the oral argument thereon, we cannot conclude that the mother raised this discrete argument (cf. Matter of Alger v Jacobs, 169 AD3d 1415, 1417 [4th Dept 2019]; see also Boulter v Boulter, 147 AD3d 1512, 1512 [4th Dept 2017]; compare Matter of Eldad LL. v Dannai MM., 155 AD3d 1336, 1338 [3d Dept 2017]), and Family Court cannot be said to have passed upon it (compare Matter of Jamilah DD. v Edwin EE., 152 AD3d 998, 1000 [3d Dept 2017]).[FN3] We therefore do not address this unpreserved claim but to say that we would, in any event, find it unpersuasive.
As the June 2016 order expressly permitted either party to commence a custody modification proceeding upon their failure to come to an agreement about where the child would attend kindergarten, no showing of a change in circumstances was needed (see Matter of Erick RR. v Victoria SS., 206 AD3d 1523, 1524 [3d Dept 2022]). The sole issue for Family Court was what custody arrangement would serve the best interests of the child, which involved consideration of factors such as each parent's past parenting performance and ability to provide for the child's physical, emotional and intellectual well-being, the quality of their home environments, whether the parent will foster a relationship between the child and the other parent and the degree to which each parent has complied with the existing custodial arrangement (see Matter of Charity K. v Sultani L., 202 AD3d 1346, 1347 [3d Dept 2022]). Given that "Family Court was in a superior position to observe and assess witness testimony and demeanor during the fact-finding hearing, its credibility assessments and factual findings are accorded great deference, and its custodial determination will not be disturbed so long as it is supported by a sound and substantial basis in the record" (Matter of Cecelia BB. v Frank CC., 200 AD3d 1411, 1414 [3d Dept 2021]).
The evidence from the fact-finding hearing reveals that the father lives in a house owned by his grandmother (hereinafter the great grandmother), together with the great grandmother and the child's paternal half sibling. It appears that he will ultimately inherit this home. He is employed full time as a heating, ventilation and air conditioning technician, and the great grandmother provides certain before and after school care to the child. The father's mother (hereinafter the grandmother) also lives nearby and is available to care for the child when needed. The mother resides in Yucca Valley, California and has for most of her life. At the time of the hearing, she had recently secured a subsidized, two-bedroom apartment where she lives with the child's [*4]maternal half sibling. She also has the benefit of family support with her mother and stepfather nearby; prior to obtaining her apartment, the mother lived with her family for about a year. The mother's sister, who appears to be very involved in the child's life, also resided in Yucca Valley at the time of the hearing, but she testified that she would be moving to Illinois when her husband was released from incarceration. As for employment, the mother had pursued various degrees once back in California, including cosmetology and phlebotomy, but it is not clear whether she completed those programs. At the time of the hearing, she worked part time at a fast-food restaurant. All witnesses agreed that the child has a close, healthy relationship with both of his half siblings.
Concerns over the child's intellectual well-being were raised. According to the grandmother, when the child returned to New York, he was significantly behind academically and did not know any colors, shapes, numbers or letters. The grandmother, the great grandmother — a former educator — and the father worked with the child to improve these skills, and the child's kindergarten teacher in New York [FN4] testified that the child was doing well in all respects. The mother denied that the child was behind as alleged, and the child's daycare teacher at the mother's cosmetology school testified describing the mother as very involved. No information was offered regarding the child's education if he were to primarily reside in California.
With respect to the child's physical well-being, a central issue at the hearing was the child's weight. According to the father and the grandmother, when the child returned to New York in July 2020, at the age of five, he weighed just under 100 pounds and had difficulty breathing during even brief exertion. There was no indication of any underlying condition that would explain the child's presumably unhealthy weight or breathing difficulties. By the time of the hearing, at the end of September 2020, the child had lost approximately 20 pounds and his breathing had apparently improved. His weight loss was generally corroborated by photographic evidence. The father attributed these changes to increased physical activity and improved nutrition. The mother denied that the child ever weighed what was purported, asserting that she provided the child with healthy meals and exercise but that his clothing made him appear larger.
Neither party approved of the other parent's alleged corporal punishment. The mother also testified that the child would return from the father's custody with injuries. However, as borne out by the mother's evidence, these injuries consisted of only a small, unexplained blister on the child's hand that became larger and inflamed as it healed. According to both the mother and her sister, whom Family Court found to be a biased witness, the father would use racial epithets and make disparaging comments about the child, the mother and the child's [*5]maternal half sibling in the presence of the child. The father admitted to his regrettable use of certain language, some of which had been captured on a video the mother took during a verbal disagreement between the two. The mother denied similar allegations with respect to her own choice of language.
Each party testified that the other has committed certain acts of domestic violence or abuse against him or her. Family Court took judicial notice of its prior proceedings and orders regarding the parties, including those relevant to the mother's initial travel to California, and found the mother's allegations to be incredible. The court also discredited testimony concerning alleged threats by the father that apparently resulted in a lockdown at the child's daycare, finding same to have coincided with the mother's false report of domestic violence — which the court viewed as an attempt to circumvent the June 2016 custody order. The mother acknowledged that she was convicted of a criminal offense in California for her physical assault of the father following their most recent breakup.[FN5] She submitted evidence that she completed a court-ordered anger management program as a result thereof.
As Family Court acknowledged, the father is not without serious faults. Nevertheless, the court carefully examined the relevant factors in its best interests analysis and found that the child could not continue living on both coasts and that the father is better able to provide for and meet the needs of the child and more likely to comply with court orders and foster the child's relationship with his other parent. Additionally, although not determinative (see Matter of Erick RR. v Victoria SS., 206 AD3d at 1526 n), we note that the attorney for the child continues to support the father having primary physical custody of the child. Deferring to the court's factual findings and credibility assessments (see Matter of Cecelia BB. v Frank CC., 200 AD3d at 1414), we find that there is a sound and substantial basis in the record to support the custody determination, and it will therefore not be disturbed.
Lynch, Reynolds Fitzgerald, Ceresia and McShan, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: Family Court issued an initial custody determination in November 2015 awarding the mother primary physical custody of the child and including provisions anticipating her return to New York and the parties' reconciliation. The father had, however, filed a second petition days before, advising the court that the mother would be remaining in California.

Footnote 2: The mother's appeal from the October 2020 order brings up for review the nonfinal order determining this jurisdictional issue (seeCPLR 5501 [a] [1]; see generally Matter of Katherine MM. v Joshua MM., 162 AD3d 1162, 1163 n 1 [3d Dept 2018]).

Footnote 3: Although Family Court also could have raised the issue of inconvenient forum upon its own motion (seeDomestic Relations Law § 76-f [1]), it did not do so.

Footnote 4: In light of the timing of the fact-finding hearing, Family Court issued a temporary order permitting the father to enroll the child in kindergarten in New York.

Footnote 5: It does not appear that the child was present during this incident.